UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| In re: | Chapter 7 |
| Richard Martin Lewiston, | Case No. 12-58599 |
| Debtor. | Hon. Phillip J. Shefferly |
| _____/ | |
| Apartments at Cambridge | Adversary Proceeding |
| Company, L.L.C., et al.,[1] | No. 12-6010-PJS |
| Plaintiffs, | |
| v. | |
| Richard Martin Lewiston, | |
| Defendant. | |
| _____/ | |

**OPINION OVERRULING OBJECTIONS TO DISCHARGE**

**I.**

**Introduction**

Richard M. Lewiston ("Debtor") is a lawyer and real estate developer who has been in the

business of developing, managing and representing real estate projects for over 50 years. During

that time, he participated as an officer, manager, investor, and partner in many complex structures

and transactions, involving dozens of entities in various forms, enjoying a high income and

_____

[1] Plaintiffs are: Apartments at Cambridge Company, L.L.C., Mickey Shapiro Trust, Asa
Shapiro Declaration of Trust, ILA I, L.L.C., ILA II, L.L.C., APTCAM, L.L.C.,
CAMAPT, L.L.C., Richards-Pitt, L.L.C., Gregory Richards CS Trust, Gregory Richards Marital
Trust, Daniel J. Smith, Richard B. Smith, Joanne Smith Purther, Kevin Spizizen, Neil Spizizen,
Kevin Spizizen Declaration of Trust, Neil Spizizen Revocable Living Trust, Nick Balberman,
and Nominal Plaintiff Gene R. Kohut, Chapter 7 Trustee.

accumulating substantial wealth. Unfortunately, over the last decade, his financial condition deteriorated greatly. Many of his business relationships collapsed into litigation – including some with individuals with whom he had close, long time and successful business relationships. As a result, the Debtor filed for relief under Chapter 7 of the Bankruptcy Code. From the start, his bankruptcy case has been filled with acrimonious litigation. Creditors filed adversary proceedings seeking to determine the nondischargeability of certain debts and to object to his discharge. The Chapter 7 trustee filed other adversary proceedings to recover fraudulent and preferential transfers, and to pursue various other theories of recovery of assets for the estate. There have been many contested matters too, including objections to exemptions, motions to compromise, and civil contempt proceedings. This opinion addresses objections to the Debtor obtaining a Chapter 7 discharge. The objections were tried before the Court over the span of several days. After carefully reviewing the record made, the Court now overrules those objections.

## II.

### Jurisdiction

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(a) and (b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(J).

## III.

### Procedural History

On August 13, 2012, the Debtor filed this Chapter 7 case. On November 19, 2012, 18 individuals and entities with whom the Debtor had done business, joined as plaintiffs to file this adversary proceeding objecting to the Debtor's discharge under § 727 of the Bankruptcy Code. On June 19, 2013, Gene R. Kohut ("Trustee"), who was elected as the permanent Chapter 7 Trustee at

the first meeting of creditors, intervened in this adversary proceeding and was added as a nominal plaintiff.

The complaint (ECF No. 1) contains only one count, but it sets forth multiple grounds to deny discharge under § 727(a)(2), (3), (4), (5), and (7) of the Bankruptcy Code. The allegations fall into three basic categories: (i) the Debtor failed to disclose in his schedules of assets and liabilities and statement of financial affairs his interests in approximately 45 business entities and his transfers of some of those interests; (ii) the Debtor disclosed false and nonexistent claims owing to him on his schedules; and (iii) the Debtor failed to keep or preserve adequate records to account for pre-petition losses of substantial assets and income.

After many vigorously contested pre-trial motions, including motions regarding discovery disputes, motions to consolidate this adversary proceeding with other adversary proceedings, and motions for summary judgment, this adversary proceeding eventually proceeded to trial. The Plaintiffs called only one witness: the Debtor. The Debtor called two witnesses: himself, and the Trustee. During the trial, the Court received into evidence the Plaintiffs' exhibits 1-54, 58-62, 65-77, 87-89, 103-104, 107, 114, 121, 128, and 155-163. The Court also received into evidence the Debtor's exhibits C, J, K, N, and AA. At the conclusion of the trial, the Court set a schedule for post-trial briefs and arguments. After closing arguments, the Court took the matter under advisement. This opinion represents the Court's findings of fact and conclusions of law under Fed. R. Bankr. P. 7052.

## IV.

### Burden of Proof

Federal Rule of Bankruptcy Procedure 4005 states that "[a]t the trial on a complaint objecting to a discharge, the plaintiff has the burden of proving the objection." The standard of proof is a preponderance of the evidence. Keeney v. Smith (In re Keeney), 227 F.3d 679, 683 (6th Cir. 2000) (citations omitted). "The burden of showing something by a 'preponderance of the evidence' . . . 'simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence.'" Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust for Southern California, 508 U.S. 602, 622 (1993) (quoting In re Winship, 397 U.S. 358, 371-72 (1970) (Harlan, J., Concurring) (brackets in original)).

## V.

### Background Facts

The Court finds the following background facts from the record made at the trial.

The Debtor has been licensed as a lawyer since 1964. He has been involved in the real estate industry in various capacities throughout that time. The Debtor's specialties are in the purchase and sale of apartments, the financing of apartments, complex land use matters, and the structuring of entities in the real estate industry. The Debtor is married to Lois Lewiston ("Lois"). They have two grown children, Leslie Etterbeek ("Leslie") and Jason Lewiston ("Jason"). Leslie is married to Jeffrey Etterbeek ("Jeffrey") (Leslie and Jeffrey are collectively referred to as the "Etterbeeks").

When the Debtor filed his Chapter 7 petition, he listed on his schedules of assets and liabilities (exhibit 1) total assets of $11,665,474.00, and total liabilities of $18,381,939.65. On lines

-4-

13 and 14 on schedule B, which require disclosure of any interests in any businesses, the Debtor listed interests in 20 separate business entities, consisting of limited liability companies, corporations, and partnerships, each of them having an "unknown" value. On line 16 on schedule B, which requires disclosure of any accounts receivable, the Debtor listed nine separate accounts receivable, each with a specific value, which together total $10,596,111.00. On line 35 on schedule B, which requires disclosure of any other personal property, the Debtor listed an interest in the Lois and Richard Lewiston Living Trust, dated September 10, 1986 ("Lewiston Trust"). Here, the Debtor elaborated that he listed the Lewiston Trust for notice purposes only, and that it is not property of his bankruptcy estate.[2] The Debtor also listed on line 35 three claims that he previously filed in three separate bankruptcy proceedings, all relating to one of his former business associates, Jeffrey Brown ("Brown"). The Debtor listed the value of these claims (collectively, the "Brown Bankruptcy Claims") as "unknown."

On his statement of financial affairs (exhibit 1), in answer to question 10a, which requires disclosure of any transfers outside of the ordinary course of business made by the debtor in the two years before bankruptcy, the Debtor stated that he made no such transfers. In answer to question 18, which requires disclosure of all businesses in which the debtor was an officer, director, managing executive, partner or 5% equity owner in the six years before bankruptcy, the Debtor listed 19 such businesses.

---

[2] On June 24, 2015, the Court issued an opinion and entered an order in adversary proceeding no. 14-5115, disagreeing with the Debtor's description on schedule B and instead holding that the Lewiston Trust is an unenforceable self-settled trust under applicable Michigan law and that the Lewiston Trust and its assets are property of the Debtor's bankruptcy estate.

-5-

On September 17, 2012, the Debtor amended schedule B and his answer to question 18 on his statement of financial affairs (exhibit 2) to add two more entities that were not previously listed. On November 20, 2012, the Debtor again amended schedule B and his answer to question 18 on his statement of financial affairs (exhibit 3) to add an interest in another entity. On December 4, 2014, more than two years after he filed bankruptcy and shortly before trial of this adversary proceeding, the Debtor filed one more amendment ("Third Amendment") (exhibit N) to change schedule B to reflect that he individually owned an interest in two other entities that he had previously believed were owned by the Lewiston Trust, and to add three more entities to his answer to question 18 on the statement of financial affairs.

At trial, the Debtor testified at length about the preparation of his schedules and statement of financial affairs and his amendments to them. The Debtor testified that, because of the history of bitter litigation with the Plaintiffs (other than the Trustee), if he filed bankruptcy, he fully expected it to be "contentious and acrimonious," and that the Plaintiffs (other than the Trustee) would "flyspeck" every bit of information in his case. As a result, he knew that he "would have to be extremely careful and detailed and . . . be as accurate as [he] possibly could." The Debtor explained that he reviewed his "last 30 years of . . . business activity, which . . . is a very complex undertaking, but [he] did the very best that [he] could." The Debtor further testified that he initially made an investigation before his schedules and statement of financial affairs were originally prepared, and that he made a further investigation as he discussed potential amendments to them with his attorneys. The Debtor testified that he believed that his schedules and statement of financial affairs were accurate when made and when he testified about them at his § 341 meeting, and that he believes they remain truthful and accurate in all respects.

-6-

# VI.

## Section 727(a)(2)

As previously noted, the Plaintiffs allege that the Debtor's discharge should be denied under § 727(a)(2), (3), (4), (5), and (7). The Court will address each subsection in sequence.

Section 727(a)(2) of the Bankruptcy Code provides as follows:

> The court shall grant the debtor a discharge, unless . . . the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed –
>
> (A) property of the debtor, within one year before the date of the filing of the petition; or
>
> (B) property of the estate, after the date of the filing of the petition.

Section 727(a)(2) "encompasses two elements: 1) a disposition of property, such as concealment, and 2) a subjective intent on the debtor's part to hinder, delay or defraud a creditor through the act disposing of the property." Keeney v. Smith, 227 F.3d at 683 (internal quotation marks and citation omitted).

The Plaintiffs allege that the first element is met because the Debtor disposed of property by concealing his interests in some entities, transferring his interests in some entities and failing to disclose both pre-petition and post-petition transfers of his interests in some entities. Altogether, Plaintiffs identified 45 different entities that the Debtor failed to disclose. In support, the Plaintiffs adduced an enormous volume of exhibits consisting of documents, letters and memoranda going back over 30 years, as well as excerpts of prior testimony given by the Debtor in other proceedings. The Plaintiffs built their case by pointing out each instance in these exhibits where the Debtor may have referred to himself either generally or specifically as holding some interest, position or

-7-

relationship. At a minimum, these exhibits, and the Debtor's extensive testimony about them, establish that the Debtor's business and financial affairs were very complex, involving many business entities, in a variety of forms, and having multiple layers of ownership. Over the 30 years covered by the Plaintiffs, it is clear that the Debtor signed hundreds of documents, letters and memoranda regarding the different business entities that he was involved in.

As for the specific interests that the Debtor is alleged to have concealed or transferred, the Debtor does not deny that he is familiar with them, or the exhibits that describe and refer to them. However, except for a couple of instances where the Debtor acknowledges that he may have made an inadvertent mistake, he insists that he did not list certain interests and transfers on his schedules and statement of financial affairs because he did not believe that he was required to do so. Because he fully expected when he filed his bankruptcy case that the Plaintiffs would try to portray him as untruthful, the Debtor testified that he carefully made a "conscious decision" regarding what entities and transfers were required to be disclosed and what entities and transfers were not.

Although the Court has sifted through all of the Plaintiffs' exhibits and the Debtor's testimony about them, it is not necessary to recite in this opinion all of the evidence regarding each and every one of the 45 entities identified by the Plaintiffs. However, to properly understand the Plaintiffs' case – which depends so heavily on the Debtor's testimony about the Plaintiffs' many exhibits – and to ascertain whether the Plaintiffs have met their burden of proof, the Court must discuss at least those exhibits, and the Debtor's testimony about them, that relate to the entities and transfers that the Plaintiffs have identified as the largest, most valuable or otherwise most important.[3]

---

[3] Some of the evidence adduced by the Plaintiffs to support their § 727(a)(2) objection is also relevant to and overlaps with the Plaintiffs' other objections to discharge, and will be discussed again to a limited extent with respect to those objections later in this opinion.

The following entities are discussed in a sequence that generally reflects the amount of probative value they have to the Plaintiffs' case and, to a lesser extent, the amount of attention given to them by the Plaintiffs during the trial.[4]

## A. Discussion of the entities

### 1. Heights Apartments

One of the most significant interests that the Plaintiffs allege that the Debtor failed to disclose pertains to the Heights Apartments, a 225-unit apartment complex located in Madison Heights, Michigan, owned by The Heights Apartments Limited Partnership. The Plaintiffs claim that the Debtor made capital contributions to the general partner of The Heights Apartments Limited Partnership in exchange for a membership interest, failed to disclose that interest, and then he fraudulently transferred his interest to Lois. The Plaintiffs' allegations are based primarily on five documents.

The first document is a copy of the operating agreement (exhibit 4) of The Heights Group, L.L.C., dated February 9, 2011. The Heights Group, L.L.C. is shown as the general partner of The Heights Apartments Limited Partnership and as also owning a minority interest in it. The members of The Heights Group, L.L.C., along with their initial capital contributions, are listed on Schedule A to the operating agreement. The Debtor and Lois are both shown as members, each with a 16-2/3% ownership interest, with the Debtor contributing $41,667.00 and Lois $41,666.00. The other two members are the Etterbeeks, each with a 33-1/3% interest and each contributing

---

[4] The Court recognizes that the Plaintiffs' post-trial brief discusses the entities and groups of entities in a different sequence.

-9-

$83,333.00. The initial capital contributions shown total $250,000.00. The operating agreement identifies the managing member as Jeffrey.

The next two documents are letters to the apartment complex's mortgage servicer (exhibit 5) and mortgagee (exhibit 11). The Debtor signed the letter to the mortgage servicer as the "managing member" of The Heights Group, L.L.C. Although Jeffrey signed the letter to the mortgagee as the "managing member" of both The Heights Apartments Limited Partnership and The Heights Group, L.L.C., the Debtor co-signed as the "Founder of The Heights Apartments Limited Partnership and Member of The Heights Group, L.L.C." The Debtor also signed the fourth document, a certificate of amendment (exhibit 7) for The Heights Apartments Limited Partnership filed with the Michigan Department of Licensing and Regulatory Affairs ("LARA"), on May 25, 2011 as "Member/General Partner" of The Heights Group, L.L.C.

The fifth document is a QuickBooks register report (exhibit 163) for the Debtor's Comerica Bank account from January 1, 2012 through August 21, 2012. On February 1, 2012, there is a deposit shown in the amount of $3,000.00 with the description "The Heights-Distribution."

The only testimonial evidence concerning the Heights Apartments came from the Debtor. He admitted that he did not disclose any interest or position, or the transfer of any interest, in either The Heights Apartments Limited Partnership or The Heights Group, L.L.C. on his schedules and statement of financial affairs. He testified that the reason was because he believed that he was not required to do so. By way of explanation, the Debtor testified that even though he was an organizer of the project to purchase the Heights Apartments, the Etterbeeks were the "primary organizers," and he served as their attorney. He also testified that his interest in The Heights Group, L.L.C. was

-10-

only a temporary interest, for which he paid nothing, and which he held only during the time that the purchase of the Heights Apartments was pending.

The Debtor further testified that Schedule A to the operating agreement does not reflect the true initial capital contributions of the four members. Instead, the Etterbeeks each actually contributed $125,000.00, while the Debtor and Lois contributed nothing. According to the Debtor, the interests in The Heights Group, L.L.C. were "reallocated" twice during the period March 11, 2011 through July 26, 2011, one day before the closing on the purchase of the Heights Apartments. In the first reallocation, the mortgage company asked for additional financial strength. With the addition of an investor, the interests were reallocated into four 25% shares, with the Debtor and Lois sharing a 25% interest. In the second reallocation, the Etterbeeks ended up with a combined 2/3 interest, with Lois holding the remaining 1/3. The Debtor explained that this 1/3 interest was given to Lois by the Etterbeeks as a gift. The Debtor admitted that he received nothing in exchange for giving up his temporary membership interest. He also admitted that, when he withdrew from The Heights Group, L.L.C., Lois was "named" to have his interest. The Debtor categorically denied that he transferred his membership interest in The Heights Group, L.L.C. to Lois in order to avoid having an asset in his name when he filed bankruptcy.

The Debtor testified that the second reallocation was linked to the closing of the purchase of the Heights Apartments. Once the sale was ready to close, he withdrew as a member of The Heights Group, L.L.C. because his presence was no longer necessary. According to the Debtor, the final revised operating agreement for The Heights Group, L.L.C. excludes him from ownership, retroactively to the formation of the company, because he never intended to have any interest, and instead just put his name on the project to start with, as a third owner. So even though the Debtor

-11-

initially was shown as having an interest in The Heights Group, L.L.C., which undisputedly held an interest in The Heights Apartments Limited Partnership, the retroactive revision of the operating agreement, in the Debtor's mind, meant that he never actually held an ownership interest in either entity.

The Debtor further explained that he viewed question 18 on the statement of financial affairs as only requiring disclosure of an interest in an entity once the entity commenced business, and not during the formation stage when it was "just a paper company." Because The Heights Group, L.L.C. commenced business operations only when it closed on the purchase of the Heights Apartments on July 27, 2011, one day after the second reallocation and after the Debtor no longer held his temporary membership interest, the Debtor did not believe that he was required to disclose any interest in it on his statement of financial affairs. Further, despite the initial operating agreement reflecting that the Debtor contributed $41,667.00 to obtain his temporary interest, the Debtor insisted that he never paid anything for that interest.

The Debtor's testimony is corroborated by a March 4, 2013 letter (exhibit 12) from Leslie to the Trustee regarding the two entities. Leslie wrote that the Debtor is not now, nor has he ever been, a partner in The Heights Apartments Limited Partnership. Schedule A to the letter lists the members of The Heights Group, L.L.C. as Leslie, Jeffrey and Lois, each with a $83,333.00 initial capital contribution.

The Debtor was also questioned regarding the QuickBooks register report (exhibit 163) showing the $3,000.00 deposit into the Comerica Bank account. Despite the title of the register report being in the Debtor's name, he testified that the bank account described in it is actually the

Lewiston Trust bank account, and that the $3,000.00 entry reflects a distribution to Lois, as a member of The Heights Group, L.L.C.

Taken together, the Debtor's testimony and the exhibits introduced by the Plaintiffs prove that the Debtor did hold a membership interest in The Heights Group, L.L.C. within six years immediately preceding the commencement of his bankruptcy case. Even if it was a temporary interest that was retroactively eliminated, as he testified, the Debtor was still required to disclose this interest in answer to question 18 on his statement of financial affairs. The evidence also proves that the Debtor in effect transferred his interest when he "withdrew" as a member sometime within the two years before he filed bankruptcy, and that he did not disclose this transfer in answer to question 10a on his statement of financial affairs.

2. BLS Green Acres Associates, Limited Partnership, Income Investors Corp., Income Opportunity Corp. and 4545 Colonial Associates, L.L.C.

A second undisclosed interest alleged by the Plaintiffs pertains to the Green Acres Village Apartments, a 224-unit apartment complex, located in Saginaw, Michigan, and owned by BLS Green Acres Associates Limited Partnership ("BLS Green Acres"). The Plaintiffs allege that the Debtor failed to disclose that he currently holds an ownership interest in BLS Green Acres, or in the three entities that have served as its general partner: Income Investors Corporation, Income Opportunity Corporation and 4545 Colonial Associates L.L.C. The Plaintiffs also allege that the Debtor made an unauthorized and undisclosed post-petition transfer consisting of a transfer by Income Opportunity Corporation of its interest in BLS Green Acres to 4545 Colonial Associates, L.L.C. in December, 2012. Finally, the Plaintiffs allege that the Debtor also failed to disclose his role as an officer of one or more of these entities.

-13-

The only information that the Debtor disclosed in his bankruptcy case at all about Green Acres Village Apartments consists of the Third Amendment (exhibit N), which lists the ownership of a joint stock interest in Income Opportunity Corporation on line 13 on schedule B and in response to question 18 of his statement of financial affairs.

Most of the Plaintiffs' evidence about these entities is found in LARA records from 1983 to 2013 for BLS Green Acres (exhibit 31), Income Investors Corporation (exhibit 32), and Income Opportunity Corporation (exhibit 33). These records show the following: Income Investors Corporation was the first general partner in BLS Green Acres, and held a 1% interest in it. On November 9, 1983, the Debtor signed the certificate of limited partnership as "president" of Income Investors Corporation. The Debtor then signed updates from 1998 to 2012 as "president" of Income Investors Corporation. Income Investors Corporation transferred its 1% interest and general partnership interest in BLS Green Acres to Income Opportunity Corporation in 1994. The Debtor also signed filings from 1998 through 2012 as "president" of Income Opportunity Corporation. Income Opportunity Corporation then transferred its interest to 4545 Colonial Associates, L.L.C. in December, 2012. The Debtor did not sign any filings for 4545 Colonial Associates, L.L.C. Instead, Jeffrey signed the initial certificate of limited partnership for 4545 Colonial Associates, L.L.C., dated December 6, 2012, as well as two filings in 2013.

The Plaintiffs introduced two other documents relating to 4545 Colonial Associates, L.L.C. First, 4545 Colonial Associates, L.L.C. appears in the Debtor's 2012 federal income tax return (exhibit 66). Schedule E of the tax return, which lists "income or (loss) from partnerships and S corps," shows a $5.00 nonpassive loss from 4545 Colonial Associates, L.L.C. during 2012.

Second, a check (exhibit 58) dated December 17, 2012, was issued by the Etterbeeks to 4545 Colonial Associates, L.L.C. for $200,000.00.

The Debtor was adamant in his testimony that he has never owned an interest in BLS Green Acres. His testimony is consistent with paragraph 12 of an affidavit (exhibit 107) that he previously filed in this adversary proceeding on June 6, 2013, stating that he has never held a direct ownership in BLS Green Acres. The Debtor testified unequivocally that his wife holds an interest in BLS Green Acres, which she inherited from her father in 2001, and that any proceeds from that interest are payable to her as a distribution from the limited partnership, and not to him.

To the best of the Debtor's recollection, Income Investors Corporation was a wholly owned subsidiary of Lewiston-Smith Realty Corporation. When asked if he thought it was necessary for him to disclose any interest in Income Investors Corporation on his schedules and statement of financial affairs, the Debtor testified that he was not an owner of this corporation and that the shares in this corporation were owned by Lewiston-Smith Realty Corporation, an entity that he admittedly held an interest in, and that he disclosed on schedule B and in response to question 18 of his statement of financial affairs. The Debtor testified that he believed that disclosing his direct interest in Lewiston-Smith Realty Corporation was sufficient to cover any indirect interest he may have in Income Investors Corporation, and that he did not believe that he was required to also separately disclose such an indirect ownership interest. The Debtor was less clear in his testimony concerning whether he was ever president of Income Investors Corporation. At first, he denied that he was president. Later, he could not remember if or when he may have been president. Eventually, he agreed that he might have been president at some time, but the corporation has not been active for many years so he could not recall the dates with precision.

The Debtor acknowledged that he and his wife do own a joint shareholder interest in Income Opportunity Corporation. The Debtor explained that they had intended to transfer their interest to the Lewiston Trust, and believed that they had done so in 2002. Having disclosed on his schedules and statement of financial affairs his interest in the Lewiston Trust, and believing at the time he filed bankruptcy that the Lewiston Trust was the actual owner of the shares of stock in Income Opportunity Corporation, the Debtor testified that he believed that he made an adequate disclosure by listing his interest in the Lewiston Trust, and that it was not necessary for him to also separately list any interest in it that was owned by the Lewiston Trust. However, the Debtor testified that some time after he filed bankruptcy, but before the trial, he reviewed the holdings of the Lewiston Trust, and realized that he and Lois had never actually transferred the shares of stock in Income Opportunity Corporation to the Lewiston Trust. The Debtor testified that once he discovered this fact, he contacted his attorney and filed the Third Amendment (exhibit N) to disclose his interest in Income Opportunity Corporation. The Debtor explained that he did not purposefully omit his interest in Income Opportunity Corporation from his original schedules and statement of financial affairs, and that he had no intent to conceal his interest, but was simply mistaken in his belief that the shares of stock in Income Opportunity Corporation were held by the Lewiston Trust at the time that he filed bankruptcy. The Debtor testified that he signed the LARA documents as president of Income Opportunity Corporation from 1998 to 2012 because he was president for those years.

The Debtor's explanation of any interest in 4545 Colonial Associates, L.L.C. (exhibit 58) was minimal. He was not questioned about the nonpassive loss or why it was included on Schedule E of his 2012 federal tax return (exhibit 66). As for the check to 4545 Colonial Associates, L.L.C., the Debtor identified the endorsement on the back of the check as his writing,

but explained that he merely delivered the check for deposit into 4545 Colonial Associates, L.L.C.'s bank account, and that the check was not his money. Finally, he testified that he only represented 4545 Colonial Associates, L.L.C. as an attorney, filed the annual reports and paid the associated filing fee, but that it is a new company and he has no interest in it.

Viewed together, the Debtor's testimony and the Plaintiffs' documents do not prove that the Debtor has ever held any interest in BLS Green Acres. Nor do they prove that he ever held an interest in Income Investors Corporation. Rather, the evidence proves that Income Investors Corporation is an entity that is owned by Lewiston-Smith Realty Corporation. To be sure, the Debtor does hold an interest in that entity, but he disclosed that interest on line 14 on schedule B and in response to question 18 of his statement of financial affairs. Although the evidence does not prove that the Debtor ever held an interest in Income Investors Corporation, it does establish that the Debtor served as president of that entity during the six years before the Debtor filed bankruptcy.

The evidence also establishes that the Debtor does hold an interest in, and was president of, Income Opportunity Corporation. Although the Debtor has now disclosed that interest in the Third Amendment, he did not do so until more than two years after filing bankruptcy.

Finally, the endorsement of the check from the Etterbeeks for deposit into 4545 Colonial Associates, L.L.C.'s bank account and the listing of a $5.00 nonpassive loss from 4545 Colonial Associates, L.L.C. on the Debtor's 2012 tax return is not sufficient to find that the Debtor has ever held any interest in 4545 Colonial Associates, L.L.C., or that he made an unauthorized and undisclosed post-petition transfer of any interest in it. Rather, the evidence proves that Income Opportunity Corporation, and not the Debtor, made a transfer of its interest to 4545 Colonial Associates, L.L.C. in December, 2012.

3. PVA Associates Limited Partnership

The Pilgrim Village Apartments is a 294-unit apartment complex in Canton Township, Michigan, owned by Pilgrim Village Associates Partnership, which in turn is owned by two partnerships, 21790 Associates and PVA Associates Limited Partnership, each owning 50%. The Debtor disclosed that he holds an interest in 21790 Associates on line 14 on his original schedule B. However, the Plaintiffs allege that the Debtor also previously owned a 6.273% interest in PVA Associates Limited Partnership, which he did not disclose. Further, the Plaintiffs allege that the Debtor sold his interest in PVA Associates Limited Partnership to the Etterbeeks, and that he did not disclose this transfer in his statement of financial affairs. The Plaintiffs claim that the Debtor was required to disclose both his interest in PVA Associates Limited Partnership and the transfer of that interest.

The Debtor did not dispute at trial that at one point in time, he was a partner in PVA Associates Limited Partnership. Nor did he dispute that there came a point in time when he sold his interest in that entity. The dispute between the Plaintiffs and the Debtor centers around the date and the amount of the sale. The documentary evidence consists of two conflicting documents. On the one hand, the Debtor reported the sale of his interest in PVA Associates Limited Partnership on his 2011 federal income tax return (exhibit 65), under long-term capital gains and losses. It shows a sale of "PVA Associates LP" on December 31, 2011, for $26,704.00. On the other hand, Leslie sent a letter (exhibit 114) to the Trustee's attorney dated March 6, 2013, in which she states that she and Jeffrey purchased their general partnership interests in PVA Associates Limited Partnership from the Debtor on July 7, 2010, for $104,000.00 cash. The date of the sale is important because

-18-

question 10a on the statement of financial affairs requires that a transfer be disclosed only if it was made within two years before bankruptcy.

The Debtor testified that his 2011 federal income tax return was simply wrong as to both the date and amount of the sale. According to the Debtor, the sale took place on July 7, 2010, as described by Leslie in her letter, which was more than two years before the Debtor filed bankruptcy. The Debtor testified that because he sold his interest to the Etterbeeks for $104,000.00 more than two years before he filed bankruptcy, he did not believe that he was required to disclose this transfer in answer to question 10a on his statement of financial affairs. In any event, the Debtor denied that the purpose of any non-disclosure was to somehow conceal the transfer of a substantial asset.

The Debtor went on to explain that the reason why his 2011 federal tax return shows the sale taking place in 2011 was to correct a mistake that was made on his 2010 federal tax return, which inadvertently omitted a portion of the proceeds received from the sale. According to the Debtor, his accountant did not allocate sufficient recaptured gain to the sale in 2010. Despite this error, the Debtor acknowledged that he never amended his 2010 return, nor did he indicate on his 2011 return that this entry was made to correct an earlier error.

Taken together, the evidence proves that the Debtor was a partner in PVA Associates Limited Partnership within six years of his filing bankruptcy. This is an interest that he was required to, but did not, disclose in answer to question 18 on his statement of financial affairs. Regarding the date that the Debtor sold his interest in PVA Associates Limited Partnership to the Etterbeeks, the evidence in the record is at best conflicting. It is not sufficient to persuade the Court to find that the December 31, 2011 sale date, as alleged by the Plaintiffs, is more probable than a July 7, 2010 sale

date, as claimed by the Debtor. The evidence does not prove that the Debtor concealed a transfer of his interest in PVA Associates Limited Partnership within two years before he filed bankruptcy.

    4. <u>LR Management Services Corporation</u>

Another disputed interest involves LR Management Services Corporation ("LR Management"), which was formed in 1999 by the Etterbeeks to manage apartment complexes and other properties. The Plaintiffs allege that the Debtor holds an undisclosed ownership interest in LR Management, and that he both manages the company and serves as an officer of it. The Debtor denies that he holds any ownership interest in LR Management, or that he currently manages any properties for it or serves as an officer of it. The Debtor's schedules and statement of financial affairs do not disclose any ownership interest in or position with LR Management.

The Plaintiffs introduced a number of documents to support their allegation that the Debtor holds an ownership interest in LR Management. The first document is a March 20, 2011 letter (exhibit 5) from the Debtor to M&T Realty Capital Corporation, a mortgage servicer for the Heights Apartments, explaining the formation of The Heights Group, L.L.C. and its intended purchase of the Heights Apartments. On the second page of the letter, the Debtor states that the Heights Apartment project will be managed by LR Management, "the owners of which are members of my family." In support of LR Management's capabilities, the Debtor attached the resume of its president, Leslie, and a list of properties managed by her. In the letter, the Debtor also states that "[w]e have, or have had, family ownership interests in substantially all of the properties listed."

Second, the Plaintiffs introduced three January 6, 2015 memoranda (exhibits 155, 156 and 157) written by the Debtor but indicating that they were from "LR MANAGEMENT SERVICES CORPORATION – Management Agent." Two of them are addressed to the partners

in 21790 Associates and the third is addressed to PVA Associates Limited Partnership. Each memorandum describes the status of the partnership and project, and announces a distribution. Throughout each memorandum, the Debtor uses the word "we." Attached to each memorandum is a check drawn on the accounts of 21790 Associates and PVA Associates Limited Partnership, written to the partners and signed by the Debtor.

Third, the Plaintiffs introduced a July 28, 2011 memorandum (exhibit 128) to the partners in PVA Associates Limited Partnership. The Debtor again uses the word "we," but unlike the other memoranda (exhibits 155-157), this memorandum does not state that it is from LR Management, but states that it is from the Debtor.

Fourth the Plaintiffs introduced an October 26, 2010 agreement (exhibit 13) that the Debtor, Lois and LR Management made with the law firm of Jaffe, Raitt, Heuer & Weiss, P.C. ("Jaffe Raitt"). The agreement concerns legal fees owing to Jaffe Raitt, and outlines a payment arrangement and the terms on which Jaffe Raitt will continue to provide legal services to the Debtor and LR Management. The Debtor signed the agreement on his own behalf and also on behalf of LR Management as "treasurer."

In his trial testimony, the Debtor described his primary relationship with LR Management as being that of attorney-client, and stated that he has represented LR Management on a variety of matters since its inception, including handling communications with its investors. The Debtor explained that he is told what distributions are to be made, then prepares an explanatory memorandum, and writes and signs the checks, all under LR Management's authority. The Debtor testified that his repeated use of the word "we" in the various memoranda to partners was merely intended by him to mean that he was speaking for LR Management and the personnel of that

-21-

company, and not for himself individually. The Debtor denied that he currently holds any ownership interest in LR Management or that he manages the Pilgrim Village Apartments through LR Management.

Although he denied holding any ownership interest in LR Management, the Debtor's testimony about his involvement with LR Management was otherwise vague. He recalled that he held a management position in 2002, and that he resigned from it, but did not know when. Also, he admitted to temporarily being the treasurer of LR Management briefly in 2010 for the limited purpose of executing the October 26, 2010 agreement with Jaffe Raitt. He conceded that, for that purpose and on that day only, he was the treasurer of LR Management. He testified that when he filed bankruptcy, he simply did not recall this temporary appointment and that is why he did not disclose it on his statement of financial affairs.

The Plaintiffs' evidence in support of their allegation that the Debtor owns an interest in LR Management consists largely of his repeated use of the word "we" in various memoranda. That is not enough by itself to prove that the Debtor holds any ownership interest in LR Management. However, the Debtor's signature on the agreement with Jaffe Raitt expressly states that he was signing the agreement in a representative capacity as LR Management's "treasurer." That is sufficient to prove that the Debtor was an officer of LR Management in 2010.

5. Practical – Michigan, Inc., Practical Development Co., Practical Home Builders, Inc. and Starlight Homes, Inc.

The Plaintiffs allege that the Debtor failed to disclose both his ownership interest in this next group of entities, and that he served as an officer or manager for them. There is no evidence as to the business purpose of these entities.

-22-

The Plaintiffs introduced LARA filings, a personal financial statement and a QuickBooks report to support their allegation that the Debtor holds ownership interests in these entities. The annual updates filed with LARA for Practical – Michigan, Inc. for 2006 to 2013 (exhibit 37), Practical Development Company for 2006 to 2012 (exhibit 38), Practical Home Builders, Inc. for 2006 to 2013 (exhibit 39), and Starlight Homes, Inc. for 2006 to 2013 (exhibit 40), were all signed by the Debtor as the "president" of each company. The Debtor's personal financial statement as of December 31, 2008 (exhibit 19) states that the Debtor held an interest in Practical – Michigan, Inc. on that date with a value of $200,000.00. Finally, the Debtor's QuickBooks report (exhibit 162) shows that the Debtor issued several $25.00 checks on behalf of these companies as late as May, 2012 for annual corporate filings with LARA.

The Debtor testified that Practical Development Co., Practical Home Builders, Inc. and Starlight Homes, Inc. are all wholly owned subsidiaries of Practical – Michigan, Inc. There is no evidence in the record to contradict this testimony. The Debtor did not disclose any information about these companies on his schedules or statement of financial affairs until just before trial when he filed the Third Amendment (exhibit N). In that amendment, he disclosed that he and Lois jointly own stock certificates in Practical – Michigan, Inc., accompanied by the statement that the Debtor "initially believed that the stock was transferred" to the Lewiston Trust but, "upon further review," the Debtor "determined that the stock certificates were never transferred" to the Lewiston Trust. This was similar to the explanation he gave regarding why he did not initially list any interest in Income Opportunity Corporation. At trial, the Debtor explained that once he discovered that the transfer of the stock certificates to the Lewiston Trust had never been completed, he promptly filed the Third Amendment to disclose his interest. As for the three subsidiaries of Practical –

-23-

Michigan, Inc., the Debtor testified that he did not list an interest in any of them because they were all owned by Practical – Michigan, Inc., not by him.

The evidence proves that the Debtor did hold an interest in Practical – Michigan, Inc. when he filed bankruptcy. He admits that fact. Although he did not initially disclose this interest, he filed the Third Amendment to disclose it. The evidence is not sufficient to support a finding that the Debtor holds any interest in Practical Development Company, Practical Home Builders, Inc. or Starlight Homes, Inc. that he was required to disclose. With no contrary evidence in the record, the Debtor's testimony proves that those entities were all owned by Practical – Michigan, Inc., not by the Debtor. However, the Debtor's multiple filings with LARA in which he describes himself as the "President" are enough to prove that the Debtor was an officer of each of those four companies during the six years preceding his bankruptcy case.

### 6. Sterling Lake Apartments and Berger/Lewiston Associates LP

Sterling Lake Apartments is a Michigan limited partnership that owns a 260-unit apartment complex in Sterling Heights, Michigan. The Plaintiffs allege that the Debtor held an ownership interest in it when he filed bankruptcy, and that he subsequently transferred that interest post-petition.

In support of their allegations, the Plaintiffs introduced LARA records for Sterling Lake Apartments (exhibit 34) and for Berger/Lewiston Associates, LP (exhibit 35). The LARA records for Sterling Lake Apartments do not show that the Debtor has ever held an ownership interest in Sterling Lake Apartments. What they show instead is that three different entities have served as general partner in Sterling Lake Apartments. The first was Berger/Lewiston Associates, LP, which became the general partner in 1984. A certificate of amendment filed on January 22, 2013, states

that Berger/Lewiston Associates, LP had assigned its partnership interest to TAP Liquidating Company, L.L.C. ("TAP") in 2006, but that the transfer was not documented with LARA until 2013. The Debtor signed this certificate as the "managing member" of TAP. A second certificate of amendment was filed on January 17, 2013, stating that the general partnership interest had been assigned to SLA Management Associates, LLC ("SLA") on December 18, 2012. This certificate was signed by Leslie as "manager/general partner" of SLA. Nothing in the LARA records pertaining to Sterling Lake Apartments shows that the Debtor has ever held an interest in that entity. But the LARA records for Berger/Lewiston Associates, LP do show that the Debtor did hold an interest in Berger/Lewiston Associates, LP as a general partner, at least during 1984, the latest date of the LARA filings for this entity.

The Debtor testified that his only interest in Sterling Lake Apartments is an indirect interest. He explained that Lewiston/Etterbeek Associates, L.L.C. is a 50% owner of SLA, and that he and Lois own a 20% interest in Lewiston/Etterbeek Associates, L.L.C. The Debtor disclosed his interest in Lewiston/Etterbeek Associates, L.L.C. on his schedule B and statement of financial affairs.

Taken together, the evidence does not prove that the Debtor has ever held an interest in Sterling Lake Apartments. At most, the evidence shows that the initial general partner of Sterling Lake Apartments was Berger/Lewiston Associates, LP and that the Debtor did hold an interest in that entity in 1984. But that's all it shows. There is no evidence in the record to show that the Debtor continued to own an interest in Berger/Lewiston Associates, LP when he filed bankruptcy. The evidence also proves that the Debtor was the managing member of TAP, the second general partner of Sterling Lake Apartments. But the Debtor disclosed that interest in answer to question 18 on his statement of financial affairs. To summarize, the evidence proves that SLA is the current

general partner of Sterling Lake Apartments, that Leslie is the manager/general partner of SLA, that Lewiston/Etterbeek Associates, L.L.C. is a member and partial owner of SLA, and that the Debtor holds an interest in Lewiston/Etterbeek Associates, L.L.C., which he disclosed. Because the evidence does not prove that the Debtor held an interest in Sterling Lake Apartments, it also does not prove that the Debtor transferred any interest in Sterling Lake Apartments post-petition.

      7. <u>Legacy Development Associates, L.L.C.</u>

      Legacy Development Associates, L.L.C. ("Legacy Development") is another disputed entity. It is a subsidiary of Lewiston/Etterbeek Associates, L.L.C. The Debtor disclosed that he holds an interest in Lewiston/Etterbeek Associates, L.L.C. on schedule B, but he did not disclose that he holds any interest in Legacy Development. The Plaintiffs claim that he should have disclosed an interest in Legacy Development and that he should have also disclosed that he served as its managing member.

      To support their allegations, the Plaintiffs introduced LARA records for Legacy Development consisting of four annual statements for the years 2006 through 2008, and 2010 (exhibit 41). The Debtor signed three of these statements as the "managing member" and one as the "manager" of Legacy Development. The only other evidence in the record about Legacy Development comes from the Debtor's testimony.

      The Debtor testified that he owned only an indirect interest in Legacy Development within six years before his bankruptcy petition, because it is a subsidiary of Lewiston/Etterbeek Associates, L.L.C. The Debtor testified that he did not believe that he was obligated to separately disclose on schedule B his indirect interest in Legacy Development, since he fully disclosed his direct interest in its parent, Lewiston/Etterbeek Associates, L.L.C. As for the allegation that he was

a "managing member" of Legacy Development because he signed its annual statements in that capacity, the Debtor explained that he routinely signs annual statements, and that his secretary types in the title for the signature line, but the title does not always reflect his actual position with a particular entity. Although he did not say so directly, he implied that he does not believe that he was ever really a "managing member" of Legacy Development.

The evidence does not prove that the Debtor holds any interest in Legacy Development. Instead, the evidence proves that the Debtor held only an indirect interest in Legacy Development through Lewiston/Etterbeek Associates, L.L.C., which he did not need to separately disclose, since he disclosed his direct interest in Lewiston/Etterbeek Associates, L.L.C.

However, despite the absence of evidence to show that the Debtor actually holds an interest in Legacy Development, the Debtor has managed to muddy the waters by describing himself in the LARA filings as a "managing member." That description ordinarily connotes both an ownership interest and a management position. It is illogical and inaccurate for the Debtor to describe himself as a "managing member" of a limited liability company if he does not actually hold a membership interest. The Debtor explained this inconsistency as being the result of the process he used for signing the annual reports filed with LARA. He testified that his secretary prepares the annual reports in "batches," and that he has signed roughly 400 such reports in the six years before filing bankruptcy. The Debtor admitted that he did not "pay tremendous attention" to the annual reports that he signed, and that he signed them without verifying that the signature line in fact reflected his true representative capacity for the entity. The Debtor further admitted that some annual reports were outright erroneous. There are no operating agreements or other organizational documents for Legacy Development in the record that contradict the Debtor's denial that he holds any ownership

interest in Legacy Development. But by holding himself out as a managing member on documents filed with LARA, the Debtor triggered a duty to at least disclose that self-described position in answer to question 18 on his statement of financial affairs. The Court recognizes the internal inconsistency in holding that the Debtor has no membership interest to disclose on schedule B but does have a management position to disclose on his statement of financial affairs. But the internal inconsistency that the Debtor created by describing himself in that manner does not absolve him from having to disclose his self-titled management position. The LARA documents (exhibit 41) that the Debtor signed as the "managing member" of Legacy Development are enough to prove that he held some management position with Legacy Development even if insufficient to prove that he held an ownership interest in it.

8. Southwest Canton Associates, L.L.C., L/B Land Associates, L.L.C., PLD Associates, L.L.C., Lewiston-Crescentini Homes, Inc., Lewiston-Richards, Inc., BLL Investment Group, L.L.C., AAC Company, L.L.C., The Blossom Lane Corporation, JR Condominium Associates, L.L.C., Country Meadows, DeWitt, L.L.C., and Berger-Realty

Although the Plaintiffs group these companies together, they do not appear from the evidence to be related in structure or purpose. In any event, the Plaintiffs allege that the Debtor failed to disclose both that he holds ownership interests in these entities, and that he holds positions in them as officer or manager.

The only documentary evidence related to these entities consists of various references that appear in the following documents: (i) LARA filings for Southwest Canton Associates, L.L.C. (exhibit 42), L/B Land Associates, L.L.C. (exhibit 43), ACC Company, L.L.C. (exhibit 48), and The Blossom Lane Corporation (exhibit 49), each signed by the Debtor as either "managing member" or "resident agent" for various years between 2006 and 2011; (ii) the Debtor's federal income tax returns for 2006 (exhibits 60), 2007 (exhibit 62) and for 2008 (exhibit 66), which list

-28-

PLD Associates, L.L.C., BLL Investment Group, L.L.C., Lewiston-Crescentini Homes, Inc., and Lewiston-Richards Inc. in various schedules; and (iii) a QuickBooks report (exhibit 162) from the Debtor's bank account showing checks issued to the State of Michigan for annual filing fees for The Blossom Lane Corporation, JR Condominium Associates, L.L.C. and Country Meadows DeWitt, L.L.C.

The Debtor testified that he did not disclose any interest in these companies on his schedules or statement of financial affairs for a number of reasons. The Debtor testified that some became inactive before 2006 once their business purposes ended (Southwest Canton Associates, L.L.C., L/B Land Associates, L.L.C. and PLD Associates L.L.C.). The Debtor testified that others were created as "shelf" entities, that had no business, no purpose and no owners ever named (ACC Company, L.L.C. and The Blossom Lane Corporation). The Debtor's only role with these companies was to act as their resident agent. The Debtor explained that still others were created by other individuals and he either had little or no involvement with them, or at most worked as a consultant (Lewiston-Crescentini Homes, Inc., Lewiston-Richards, Inc., JR Condominium Associates, L.L.C., Country Meadows DeWitt, L.L.C. and Berger-Realty). Finally, one of these entities was entirely unknown to him (BLL Investment Group, L.L.C.).

The record regarding these entities was not developed at trial in any detail. The scant evidence in the record does not persuade the Court that it is more probable than not that the Debtor held an interest in any of these entities. Although the evidence shows that the Debtor signed annual reports as "managing member" for Southwest Canton Associates, L.L.C. and L/B Land Associates, L.L.C. for 2006 to 2008, there are no organizational documents or other evidence that tend to show that the Debtor held a membership interest in these two entities. By themselves, the

annual reports are insufficient to prove that the Debtor held a membership interest. But by holding himself out as the "managing member," the Debtor once again muddied the waters and, at a minimum, triggered a duty to disclose that he held some management position with Southwest Canton Associates, L.L.C. and L/B Land Associates, L.L.C. The evidence does not prove that the Debtor ever held a position with any of the other entities except as "resident agent."[5]

9. Stratford Apartments, L.L.C. (f/k/a Stratford Associates), LJR Associates, L.L.C., and 3490 Company, L.L.C.

This group of entities relates to Stratford Villa Apartments, a 134-unit apartment complex in Oak Park, Michigan, owned by Stratford Apartments, L.L.C. The Plaintiffs allege that the Debtor currently holds ownership interests in Stratford Apartments, L.L.C., LJR Associates, L.L.C. and 3490 Company, L.L.C., and holds a position in them as officer or manager, all of which he should have disclosed in his schedules and statement of financial affairs but did not. The Plaintiffs further allege that the Debtor has made transfers of his interest in Stratford Apartments, L.L.C., both to LJR Associates, L.L.C. and to 3490 Company, L.L.C., which he should have disclosed in his answer to question 10 on his statement of financial affairs.

In support of their allegations that the Debtor held an ownership interest and transferred that interest, the Plaintiffs introduced a March 6, 2013 letter (exhibit 16) from Leslie to the Trustee, in which Leslie gives a brief history of Stratford Apartments, L.L.C., and lists its members as including LJR Associates, L.L.C., with a 26% interest, and the Lewiston Trust, with a 24% interest. Leslie also notes that LJR Associates, L.L.C. acquired its interest from the Lewiston Trust on September 15, 2010 for the sum of $186,500.00. In support of their allegation that the Debtor is an officer or

---

[5] Resident agent is not one of the positions required to be disclosed by question 18 of the statement of financial affairs.

manager of these entities, the Plaintiffs introduced a certificate of assumed name (exhibit 15) that was filed with LARA on August 12, 2011, and signed by the Debtor as a "member" of Stratford Apartments, L.L.C. In addition, the Plaintiffs introduced an annual statement (exhibit 17) that was filed with LARA on December 7, 2010, and was signed by the Debtor as the "managing member" of LJR Associates, L.L.C. in 2011.

The Debtor testified that he individually does not own any interest in Stratford Apartments, L.L.C., and that his only interest at all in this entity is an indirect interest that is held by the Lewiston Trust. The Debtor testified that he believed that he was not required to disclose any interest in Stratford Apartments, L.L.C. because he disclosed his interest in the Lewiston Trust. The Debtor acknowledged that LJR Associates, L.L.C. owns a 26% interest as a member in Stratford Apartments, L.L.C. He also conceded that he initially held a 1% interest in LJR Associates, L.L.C. in his own name, but testified that he did not pay anything for that interest. He explained that the Etterbeeks paid 100% of the capital for that entity, and they own 100% of it. The Debtor also testified that 3490 Company, L.L.C. was formed in order to hold the Lewiston Trust's interest in Stratford Apartments, L.L.C. , and that the sole member of 3490 Company, L.L.C. was the Lewiston Trust. He denied that he had any intent to conceal any transfer of an interest in Stratford Apartments, L.L.C., or that the purpose of forming 3490 Company, L.L.C. was to keep any interest in Stratford Apartments, L.L.C. out of the bankruptcy estate.

Taken together, the evidence does not prove that the Debtor, individually, holds an interest in any of these entities. There are no organizational documents or other evidence that tend to show that the Debtor actually held a membership interest in Stratford Apartments, L.L.C. or LJR Associates, L.L.C. Instead, the evidence proves that the Lewiston Trust and LJR Associates, L.L.C.

both hold interests in Stratford Apartments, L.L.C. The Lewiston Trust holds its interest through 3490 Company, L.L.C. LJR Associates, L.L.C. obtained its interest from the Lewiston Trust. Because the evidence does not prove that the Debtor holds any interest in Stratford Apartments, L.L.C., LJR Associates, L.L.C. or 3490 Company, L.L.C., he was not required to disclose any interest in them on his schedules and statement of financial affairs. Because the evidence does not prove that the Debtor held an interest in Stratford Apartments, L.L.C., LJR Associates, L.L.C. or 3490 Company, L.L.C., it also follows that the evidence does not prove that the Debtor transferred any interest in these entities.

Although the evidence is insufficient to prove that the Debtor individually holds an ownership interest in any of these entities, or that he made a transfer of any interest in these entities, the exhibits that the Debtor signed as either "member" or "managing member" for Stratford Apartments, L.L.C. and LJR Associates, L.L.C., do establish that the Debtor held management positions with each of those entities.

10. <u>BLS Lathrup Associates, BLS Rosemack Associates, BLS Shopping Center Associates, LP, Income Advisors Company and Pat-Jack Associates</u>

This is a group of related entities that owned shopping centers in metro Detroit. The Plaintiffs allege that the Debtor failed to disclose his interests in these companies in his schedules and statement of financial affairs.

The evidence adduced by the Plaintiffs concerning these entities consists of documents obtained from LARA going back to the early 1980's, and references to line items on the Debtor's federal income tax returns.[6] The LARA records show that Debtor signed the certificates of limited

---

[6] Although the Plaintiffs rely in their post-trial brief on the Debtor's federal income tax returns for 2006 to 2012, the returns for 2009 (exhibit 63) and 2010 (exhibit 64) were not

partnership for BLS Lathrup Associates (exhibit 44), BLS Rosemack Associates (exhibit 45) and BLS Shopping Center Associates, LP (exhibit 46) on behalf of Income Advisors Company and Income Investors Corporation,[7] which were partners of these three entities. There are no LARA records showing that the Debtor signed any documents on behalf of these three entities themselves. BLS Rosemack Associates and BLS Shopping Center Associates, LP appear only in the Debtor's 2006 tax return (exhibit 60) in a reconciliation schedule. However, the Debtor was not questioned about the significance or meaning of this schedule. The only evidence concerning Pat-Jack Associates is also in the Debtor's 2006 federal income tax return, which states that the Debtor had a non-passive loss of $285.00 for this entity in 2006.

The Debtor offered a number of explanations for why he did not disclose any ownership interest in these entities. The Debtor testified that the shopping centers owned by these entities were sold years ago, and that none of these entities had any current business operations when he filed bankruptcy. The Debtor also testified that he did not disclose any ownership interest in Income Advisors Company because it is owned by the Lewiston Trust, but this testimony is somewhat contradicted by the Plaintiffs' exhibits. According to a QuickBooks report (exhibit 160) for the Debtor's personal bank account for the years 2006 through 2011, the Debtor twice deposited distributions from Income Advisors Company into his personal bank account in 2006 and 2007, instead of into the Lewiston Trust bank account. The Debtor admitted that at one time he did hold an interest in Pat-Jack Associates, which he inherited when his mother passed away. He testified

admitted into evidence.

[7] As discussed earlier in this opinion, Income Investors Corporation is owned by Lewiston-Smith Realty Corporation, which the Debtor disclosed on schedule B and in response to question 18 of his statement of financial affairs.

that the shopping center that it owned was sold on a land contract in the late 1980's, and that the last payment on the land contract was made in 2005 or 2006, after which the small amount of funds left in Pat-Jack Associates' bank account were distributed and the account closed. The Debtor explained that the $285.00 non-passive loss reflected in his 2006 income tax return is attributable to this last distribution.

The evidence is not sufficient to prove that the Debtor holds an interest in BLS Lathrup Associates, BLS Rosemack Associates or BLS Shopping Center Associates, LP. The evidence proves that it is the Lewiston Trust, not the Debtor, that holds an interest in Income Advisors Company, although the Debtor did not always deposit distributions from Income Advisors Company into the Lewiston Trust bank account, but instead treated those distributions as his personal income. As for Pat-Jack Associates, at most, the evidence proves only that the Debtor held an interest in that entity in 2006, and that he received a final distribution during that year of the funds remaining in the bank account. Although there is nothing in the record to show that this interest had substantial value, it was nonetheless an interest that the Debtor held within six years immediately preceding the commencement of his bankruptcy case. As such, the Debtor was required to disclose it in answer to question 18 on his statement of financial affairs.

11. Richard M. Lewiston Company

This entity is related to Pilgrim Village Apartments, which was previously discussed. The Richard M. Lewiston Company ("RMLC"), a Michigan partnership, owns 40% of 21790 Associates, which in turn owns 50% of Pilgrim Village Apartments. The Lewiston Trust owns a 1% interest in RMLC. At one point in time, the Lewiston Trust owned a larger share, but in January, 2009, it sold all but 1% to the Etterbeeks. The Plaintiffs allege that the Debtor individually was the owner of the

-34-

interest in RMLC, instead of the Lewiston Trust, and that he should have, but did not, disclose his ownership interest and the 2009 transfer of all but 1% of that interest to the Etterbeeks.

There is some evidence that supports the Plaintiffs' allegations. The Plaintiffs introduced a page from a transcript (exhibit 103, page 170) of the Debtor's February 12, 2009 deposition testimony in an arbitration proceeding concerning Brown. In it, the Debtor stated that he, his brother and sister-in-law are the members of RMLC. The Debtor did not mention the Lewiston Trust as having any interest.

In response, the Debtor testified that he did not disclose any interest in RMLC in his schedules or statement of financial affairs because he personally does not hold any interest in RMLC. The Debtor testified that at one time he held an interest in RMLC, but explained that he transferred whatever interest he may have had to the Lewiston Trust in 1986. He further testified that the Lewiston Trust subsequently sold all but 1% of its interest in RMLC to the Etterbeeks in January, 2009. The Debtor called his choice of words in the Brown arbitration proceeding "careless" and further stated he should have clarified that the Lewiston Trust was the co-owner of RMLC.

There is some evidence that supports the Debtor's testimony at trial. The Debtor signed an Assignment of Partnership Interest (exhibit J) on September 10, 1986, assigning his interest in RMLC to the Lewiston Trust. The Debtor wrote a letter (exhibit 24) to the Trustee on June 24, 2014, explaining RMLC's indirect interest in Pilgrim Village Associates, the transfer from him to the Lewiston Trust in 1986, and the sale of all but 1% of the Lewiston Trust's interest to the Etterbeeks on January 1, 2009. Attached to the Debtor's letter are copies of four checks from the Etterbeeks, which the Debtor stated represent the full $134,000.00 purchase price. One check, for

-35-

$55,000.00, is payable to the Lewiston Trust. The remaining three checks are payable to the Debtor individually. The QuickBooks report (exhibit 160) shows the deposits of the three checks to the Debtor's individual bank account.

The evidence is not sufficient to prove that the Debtor individually holds any interest in RMLC. Instead, the evidence proves that the Lewiston Trust holds an interest in RMLC, and that it transferred all but 1% of that interest to the Etterbeeks in 2009.

12. RSJC Associates, LP and the Affiliated Partnerships

This is a group of related entities whose business dates back many years. In 1982, the Debtor and Stanley Berger, the Debtor's long-time business partner, acquired a portfolio of properties, most of which were apartment complexes. To manage the portfolio, the Debtor and Berger formed ten limited partnerships. The Plaintiffs refer to the entities as RSJC Associates and its nine "affiliated partnerships" ("Affiliated Partnerships"). The Plaintiffs allege that the Debtor owned an interest in RSJC Associates and the Affiliated Partnerships, which he should have but did not disclose. They further allege that between May and September, 2006, RSJC Associates and the Affiliated Partnerships sold their interests in the apartment complexes and most of the other real estate, and that the sales netted the Debtor $27.9 million.

The only documentary evidence concerning RSJC Associates and the Affiliated Partnerships consists of a March 19, 2013 letter (exhibit 50) that the Debtor wrote to the Trustee's attorney. The letter and the documents that accompany it describe the purchase of the real estate portfolio, the creation of RSJC Associates and the Affiliated Partnerships, the disposition of the assets in the portfolio, and the distributions made to the partners in RSJC Associates and the Affiliated Partnerships. The only asset remaining after those dispositions was an office building, which was

-36-

conveyed at the end of 2006 to TAP, a newly formed entity at that time and which was owned by the partners in the Affiliated Partnerships. The 2006 federal income tax returns of RSJC Associates and the Affiliated Partnerships were the final returns for those entities. The exhibits to the Debtor's March 19, 2013 letter show that the sale proceeds from the disposition of the assets that was allocated to the Debtor totaled $27,335,971.00.

The Debtor does not dispute that he had an interest in RSJC Associates and the Affiliated Partnerships, which generated millions of dollars in income for him. According to the Debtor, his 2006 federal income tax return (exhibit 60) included the income that he received from the sales of those interests. Consistent with the letter, the Debtor testified that RSJC Associates and the Affiliated Partnerships liquidated their holdings in May, 2006 and effectively ceased business. The Debtor explained that when he filed bankruptcy, the six-year look back period described in question 18 on the statement of financial affairs, extended back to August 13, 2006. Because RSJC Associates and the Affiliated Partnerships were no longer operating as of that date, had no revenue, and had already distributed all of the proceeds from the sale of their assets, the Debtor testified that he believed that no disclosure of any interests in these entities was required.

The evidence does prove that the Debtor at one time held interests in RSJC Associates and the Affiliated Partnerships, but that the Debtor sold those interests in May, 2006, which was outside of the period for which disclosure was required.

### B. Did the Debtor dispose of property?

After thoroughly reviewing all of the Plaintiffs' documentary evidence, and the Debtor's testimony about these documents, the Court finds that the Plaintiffs did not meet their burden to show by a preponderance of the evidence that when he filed bankruptcy, the Debtor held any

-37-

interests in any business entities that he was required, but failed, to disclose on either line 13 or line 14 of his schedule B.

However, the Court finds that the Plaintiffs did meet their burden to show by a preponderance of the evidence that the Debtor made a pre-petition transfer of an interest in The Heights Group, L.L.C., that he was required, but failed, to disclose in answer to question 10a on his statement of financial affairs. The failure to disclose this transfer constitutes a concealment of property sufficient to meet the requirement of a disposition under § 727(a)(2)(A).

The Court also finds that the Plaintiffs did meet their burden to show by a preponderance of the evidence that the Debtor held interests in three separate business entities, The Heights Group, L.L.C., PVA Associates Limited Partnership and Pat-Jack Associates, during the six years before bankruptcy that he was required, but failed, to disclose in answer to question 18 on his statement of financial affairs. The Debtor's failure to disclose these interests constitutes a concealment of property sufficient to meet the requirement of a disposition under § 727(a)(2)(A).

The Court also finds that the Plaintiffs did meet their burden to show by a preponderance of the evidence that the Debtor held positions in the following businesses during the six years before bankruptcy that he was required, but failed, to disclose in answer to question 18 on his statement of financial affairs: BLS Green Acres Associates, Limited Partnership, Income Investors Corporation, Practical – Michigan, Inc., Practical Development Company, Practical Home Builders, Inc. and Starlight Homes, Inc. (president); LR Management (treasurer); and Legacy Development, Southwest Canton Associates, L.L.C., L/B Land Associates, L.L.C., Stratford Apartments, L.L.C. and LJR Associates, L.L.C. (management position). However, the Debtor's failure to list these positions in his answer to question 18 on his statement of financial affairs is not a concealment of property, only

-38-

of positions. While the Debtor's failure to disclose all of his positions is relevant to the Plaintiffs' other objections to discharge, and will be more specifically discussed in the sections of this opinion dealing with those objections, it is not relevant to the Plaintiffs' § 727(a)(2)(A) objection since it does not constitute a concealment, or disposition, of property.

C. <u>Did the Debtor have subjective intent to defraud?</u>

The Plaintiffs have proven the first element of § 727(a)(2). However, to prevail under § 727(a)(2), it is not enough for the Plaintiffs to prove that there has been a disposition of property, such as concealment. The Plaintiffs must also prove the second element of § 727(a)(2) – that the disposition was made with subjective intent to defraud.

The Plaintiffs have alleged throughout this case that the Debtor is not truthful. They have alleged that he has not been honest in the prosecution of his Chapter 7 case. The Plaintiffs have assembled a substantial volume of exhibits, many signed by the Debtor, others sent to the Debtor, and still others referred to the Debtor. These exhibits, the Debtor's own testimony, and the Debtor's schedules and statement of financial affairs show that the Debtor has been involved for decades in numerous complex real estate entities and transactions. Many of them are difficult to understand. The record demonstrates that the Debtor's business and financial affairs are tangled and complicated. And, to be sure, the exhibits and the Debtor's own testimony reveal a number of inconsistencies. Some of the Debtor's understandings about his interests and transactions were shown to be erroneous. Moreover, the Debtor's own treatment of certain of his interests – such as those in the Lewiston Trust – do not comport with the documentation that exists for such interests.

The Debtor offered his explanations for the various inconsistencies and for any errors in documentation and correspondence. Some of the Debtor's explanations were based on erroneous

assumptions and understandings. For example, he was mistaken that his interest in Income Opportunity Corporation had been transferred to the Lewiston Trust, and therefore did not need to be separately disclosed. The Debtor also made an erroneous assumption in believing that he did not have to disclose his interests in entities that had been non-functional for many years, despite the fact that he continued during those years to sign annual updates as their president. The Debtor was also incorrect in his belief that he did not need to disclose his interest in The Heights Group, L.L.C. because that interest was retroactively eliminated when the purchase of the apartment complex closed. In addition, the Debtor's memory also failed at times, for example when he had not recalled that he was a treasurer of LR Management Services Corporation for the purpose of executing the agreement with Jaffe Raitt. The Debtor himself added to the confusion by signing "batches" of annual reports to be filed with LARA, to which he did not "pay tremendous attention." This carelessness lead to many errors in the LARA documents.

The question for the Court is whether these inconsistencies, errors and omissions, resulting in concealment of certain of the Debtor's interests and transfers, were made with fraudulent intent. The Court listened closely to the Debtor's testimony and observed his demeanor over four full days of testimony. At times, the Debtor struck the Court as difficult and argumentative. But the Debtor's testimony did not strike the Court as untruthful. His explanations for why he did not disclose certain interests or transfers on his schedules and statement of financial affairs were plausible, based on sincere, albeit sometimes erroneous, understandings. The Debtor was involved in many business entities over a 50 year career in the real estate industry. He admitted that he does not recall each and every entity and each and every transaction. But there is no testimony in the record to controvert the Debtor's statements that because of the history of his litigation pre-petition with the Plaintiffs

(other than the Trustee), the Debtor fully expected that everything that he did in this case would be meticulously scrutinized by them. Nor is there any testimony to contradict the Debtor's testimony that he had no incentive to be deceitful, and was well aware that any errors in his schedules and statement of financial affairs would be magnified. Further, the Debtor's attention to detail in the preparation of his schedules and statement of financial affairs, and the correspondence that he sent to the Trustee explaining his various interests, are not the hallmarks of someone who is trying to deceive his creditors and the Court by concealing assets and transfers of them.

In sum, the Court accepts the Debtor's testimony about why he did or did not disclose interests and transfers. The Debtor's testimony was credible, even when mistaken. The Court finds that the Plaintiffs failed to meet their burden to prove by a preponderance of the evidence the second element of § 727(a)(2) – that the Debtor had subjective intent to defraud when he failed to list all of his interests and transfers in his schedules and statement of financial affairs.

## VII.

### Section 727(a)(3)

Section 727(a)(3) provides for denial of discharge if "the debtor has . . . failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act . . . was justified under all the circumstances of the case . . . ."

> To sustain an objection to a discharge under § 727(a)(3), the proof must establish: (1) either that the debtor failed to keep or preserve any recorded information, including books, documents, records and papers, or that the debtor or someone acting for him destroyed, mutilated, falsified, or concealed any recorded information including books, documents, records and papers; and (2) that as a result, it is impossible to ascertain the financial condition and material business transactions of the debtor. The party seeking denial of a discharge has the burden of proving the inadequacy of the debtor's records. However, [o]nce a debtor's records are

-41-

determined to be inadequate, the burden is on the debtor to establish any justification therefor.

Solomon v. Barman (In re Barman), 244 B.R. 896, 900 (Bankr. E.D. Mich. 2000) (internal quotation marks and citations omitted).

The Plaintiffs' evidence of the elements of § 727(a)(3) is very thin.  The Plaintiffs concede that the Debtor produced four years of bank statements from 2007 through 2010 and that he produced tax returns and other financial records, including QuickBooks reports.  But the Plaintiffs insist that the Debtor did not produce enough.  First, as to the financial documents that the Debtor did produce, the Plaintiffs point out that there are many entries that are labeled "transfer" or "miscellaneous" without further explanation.  Second, the Plaintiffs argue that they have made various discovery requests that the Debtor has objected to throughout the course of this adversary proceeding and the Debtor's bankruptcy case.

The Plaintiffs elicited testimony about these objections from both the Debtor and the Trustee. The Debtor testified that no one, neither the Trustee nor the other Plaintiffs, ever asked him about the entries labeled "transfer" or "miscellaneous."  The Debtor also testified that no one ever contacted him requesting follow-up documentation or an explanation after he provided his bank statements to the Trustee.

The Trustee did not testify at all in the Plaintiffs' case in chief, but when the Debtor called the Trustee to the stand, his testimony regarding the Debtor's alleged failure to keep or preserve records was very cryptic.  The Trustee acknowledged that he retained the Conway MacKenzie firm to provide financial, advisory and litigation support services during the Debtor's bankruptcy case. He recognized a June 7, 2013 affidavit (exhibit AA) signed by Thomas J. Schwartzenberger of Conway MacKenzie.  The Trustee agreed that Schwartzenberger's affidavit concluded that

Apartments at Cambridge Company, L.L.C., one of the entities that the Debtor disclosed on line 16 of schedule B as owing him an account receivable, did owe the Debtor in excess of $5 million based upon Schwartzenberger's review of the Debtor's bank statements from April, 2006 through May, 2013, and other records. And the Trustee conceded that he was successful in recovering money from Apartments at Cambridge Company, L.L.C. for the benefit of the Debtor's bankruptcy estate. The Trustee's attorney then asked the Trustee in a more general way whether, in connection with the bank statements referenced in Schwartzenberger's affidavit, the Debtor had "provided full cooperation" to the bankruptcy estate and its attorneys. The Trustee responded by saying that he had requested bank statements for approximately seven years, from April, 2006 through May, 2013 some of which were provided to him by the Debtor, but that the Debtor had not provided other bank statements. When pressed more specifically by his own attorney, the most that the Trustee would say was that "I think there's been a couple of occasions where we've requested information and have not been provided information." The only facts established by the Trustee's testimony are that the Debtor provided several years of bank statements and that the Trustee's financial experts concluded that a substantial sum of money was owed to the Debtor by Apartments at Cambridge Company, L.L.C., just as the Debtor had listed on his schedules. Those facts do not prove a failure to keep or preserve records, or that the Debtor concealed any records that he did have.

As for the Plaintiffs' second assertion that the Debtor objected to certain discovery requests during the litigation of this adversary proceeding on the grounds of relevancy, scope and burden, there is no evidence in the record that the Plaintiffs ever challenged such objections by requesting the Court to compel the Debtor to produce the requested discovery, or that the Court ever held that those objections were not meritorious. Just because the Plaintiffs and the Debtor took different legal

-43-

positions on what is discoverable in this adversary proceeding does not, by itself, mean that the Plaintiffs have shown that the Debtor has failed to keep or preserve records or that he concealed any records that he did have. The Plaintiffs failed to meet their burden to prove the first element of § 727(a)(3).

More importantly, even if the Court were to find that the Debtor failed to keep or preserve records, or somehow concealed his records, the Debtor's discharge can only be denied under § 727(a)(3) if, as a result of the Debtor's failure to keep or preserve records, or concealment of records, it is impossible to ascertain the financial condition and material business transactions of the Debtor. On this element, the Plaintiffs' proofs fall woefully short. The Plaintiffs adduced no evidence to show that any failure to keep or preserve records, or any concealment of records, in any way either prevented the Debtor's financial condition from being ascertained or otherwise interfered with the administration of this estate.

Here, the Trustee's testimony was more powerful, and ultimately more revealing, by what he did not say rather than what he did say. The Trustee did not offer any testimony to suggest, even in the most remote way, that he has somehow been unable to administer this complicated Chapter 7 estate.[8] Equally conspicuous is the absence of any testimony by any of the Plaintiffs other than the Trustee. While it is not unusual for a party objecting to an individual's discharge to rely primarily on such individual's own testimony, the record in this case, consisting entirely of the Debtor's

---

[8] The Court file reflects that the Trustee has in fact administered substantial assets in this Chapter 7 case, including recovery of $600,000.00 in cash from the Apartments at Cambridge Company, L.L.C. and $5 million from the sale of its undeveloped real property. The Trustee has also obtained a declaratory judgment that the Lewiston Trust and its contents are property of this bankruptcy estate, and he is either pursuing or has pursued 15 other adversary proceedings to continue to recover assets for this estate.

-44-

uncontroverted testimony about the Plaintiffs' mountain of exhibits, simply does not prove that any failure by the Debtor to keep or preserve records, or his concealment of records, has in any way made it impossible to ascertain the Debtor's financial condition and material business transactions.

## VIII.

### Section 727(a)(4)(A)

Section 727(a)(4)(A) provides for denial of discharge if "the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account."

> In order to deny a debtor discharge under this section, a plaintiff must prove by a preponderance of the evidence that: 1) the debtor made a statement under oath; 2) the statement was false; 3) the debtor knew the statement was false; 4) the debtor made the statement with fraudulent intent; and 5) the statement related materially to the bankruptcy case.

Keeney v. Smith, 227 F.3d at 685 (internal quotation marks and citation omitted).

> [A] fraudulent statement must be made with a knowing intent to defraud creditors. . . . The plaintiff must demonstrate actual, not constructive, fraud. However, since defendants will rarely admit their fraudulent intent, actual intent may be inferred from circumstantial evidence. A series or pattern of errors or omissions may have a cumulative effect giving rise to an inference of an intent to deceive. On the other hand, the discharge is not to be denied when the untruth was the result of a mistake or inadvertence.

Stevenson v. Cutler (In re Cutler), 291 B.R. 718, 726 (Bankr. E.D. Mich. 2003) (internal quotation marks and citations omitted). "'Even if the debtor thinks the assets are worthless, he must nevertheless make full disclosure.'" Lewis v. Summers (In re Summers), 320 b.R. 630, 647 (Bankr. E.D. Mich. 2005) (quoting Armstrong v. Lunday (In re Lunday), 100 B.R. 502, 508 (Bankr. D.N.D. 1989) (citation omitted)).

The Plaintiffs allege that the Debtor made multiple false oaths in his schedules and statement of financial affairs in two basic ways: first, by failing to disclose business interests that he owns,

transfers that he made of some of those interests, and positions that he has held in various businesses; and second, by affirmatively and falsely disclosing assets that he knew that he did not own. The Court will address these two arguments in sequence.

As noted in the discussion of § 727(a)(2), the Plaintiffs did prove that the Debtor failed to disclose: (i) his interests in The Heights Group, L.L.C., PVA Associates, Limited Partnership and Pat-Jack Associates; (ii) the transfer of his interest in The Heights Group, L.L.C.; and (iii) the positions that he held in BLS Green Acres Associates, Limited Partnership, Income Investors Corporation, Practical – Michigan, Inc., Practical Development Company, Practical Home Builders, Inc., Starlight Homes, Inc., LR Management, Legacy Development, Southwest Canton Associates, L.L.C., L/B Land Associates, L.L.C., Stratford Apartments, L.L.C. and LJR Associates, L.L.C. The Debtor's failure to disclose these facts constitutes false statements under oath. However, in order for such false oaths to provide a basis for denial of discharge under § 727(a)(4)(A), the Plaintiffs must prove that the Debtor knew that his statements were false and that he made them with fraudulent intent.

As explained earlier in this opinion, the Court found the Debtor to be credible – albeit difficult and erroneous at times – in his testimony about his many business interests, transfers and positions. The Debtor testified without contradiction that he fully expected that the Plaintiffs would put his schedules and statement of financial affairs under a microscope. And they did. As detailed earlier, they proved that the Debtor made a number of errors. However, he had an explanation for every omission ranging from a belief that the Lewiston Trust owned a given entity, to a decision not to include an entity because it had been inactive for decades or was created as a "shelf" entity with no business activity. The Court is not persuaded by the evidence either that the Debtor knew that

-46-

any of his statements regarding his interests, transfers or positions in business entities were false, or that he made such statements with intent to deceive. The Court finds that the Debtor's failures to disclose information on his schedules and statement of financial affairs was the product of inadvertence or just plain mistakes, but was not because of an intent to defraud.

The Plaintiffs also allege that the Debtor made false oaths by listing assets on his schedules and statement of financial affairs that he knew he did not own, specifically the Brown Bankruptcy Claims and certain accounts receivable. Turning first to the Brown Bankruptcy Claims, the Plaintiffs argue that the Debtor falsely disclosed $18,565,000.00 of such claims on line 35 on his schedule B, consisting of the following:

| $7,017,000.00 | Brown Properties Corporation | case no. 09-55674 |
| $9,417,000.00 | Jeffrey Howard Brown | case no. 09-60375 |
| $2,131,000.00 | Wittlesey Associates, Inc. | case no. 09-55806 |

According to the Plaintiffs, the Debtor disclosed the Brown Bankruptcy Claims even though he knew they did not exist in an effort to mislead the Trustee into believing that there were substantial assets that the Trustee could recover for this estate. The Plaintiffs' theory is that the Debtor would somehow gain favor with the Trustee by making the bankruptcy estate appear to have substantial assets for the Trustee to administer, while at the same time distracting the Trustee from pursuing other more meritorious actions against the Debtor to remedy his wrongdoing.

In support, the Plaintiffs introduced the docket sheet in the Brown Properties Corporation bankruptcy case (exhibit 67) to show that the Brown Properties Corporation bankruptcy case was closed on February 28, 2012, before the Debtor filed his own bankruptcy. As a result, the Plaintiffs argue that the Debtor had to have known that his claim in the Brown Properties Corporation bankruptcy case was worthless. The Plaintiffs also introduced the discharge (exhibit 68) entered in

-47-

Brown's individual Chapter 7 bankruptcy case on August 3, 2011. The Plaintiffs assert that this discharge proves that the Debtor knew that his claim in Brown's bankruptcy case was worthless when he filed his own bankruptcy case. As for the Debtor's claim in the Wittlesey Associates, Inc. bankruptcy case, the Plaintiffs introduced three transfer of claim documents (exhibits 71, 73 and 74) dated May 10, 2012, April 30, 2012 and May 3, 2012, purporting to transfer the Debtor's claim in the Wittlesey Associates and Brown bankruptcy cases to Jaffe Raitt. The Plaintiffs also introduced the Chapter 7 trustee's final account and distribution reports (exhibits 72 and 75) in the Brown and Wittlesey Associates, Inc. bankruptcy cases.

The Plaintiffs questioned the Debtor extensively at trial about these exhibits, all in an effort to show that the Debtor knew that the Brown Bankruptcy Claims were either false or worthless when he filed his bankruptcy case. The Debtor testified that he believed that the Brown Bankruptcy Claims were all valid when he filed his own bankruptcy case. The Debtor knew that he had filed the Brown Bankruptcy Claims, but he never testified that they had any specific value. In fact, his original and amended schedule B always reflected the Brown Bankruptcy Claims as having an "unknown" value. His testimony shows that he was not very familiar with the exhibits relied upon by the Plaintiffs. The Debtor testified that he listed the Brown Bankruptcy Claims only in an effort to ensure full disclosure of all of his assets.

The Plaintiffs did not adduce evidence to show that the Brown Bankruptcy Claims did not exist. Rather, the evidence that the Plaintiffs adduced tends to show that the Brown Bankruptcy Claims did exist, but did not have value at the time that the Debtor filed his bankruptcy case. That is insufficient to prove that the Debtor's listing of the Brown Bankruptcy Claims constitutes a false

-48-

oath. Because the disclosure of the Brown Bankruptcy Claims is not a false statement under oath, the first element of § 727(a)(4)(A) is not met.

Similar to their contention that the Debtor listed the Brown Bankruptcy Claims in an effort to mislead the Trustee into believing that there are more assets in this case than actually exist, the Plaintiffs contend that the Debtor also made a false oath by disclosing seven false accounts receivable on line 16 on schedule B, consisting of two groups. The first group relates to claims ("Cherry Hill Claims") owed to him by the following entities and in the amounts indicated:

| | |
|---|---|
| Cherry Hill/Denton Group, L.L.C. | $1,043,330.00 |
| Wellesley Building Company, L.L.C. | $ 623,240.00 |
| Wellesley Building Company II, Inc. | $ 694,033.00 |
| Total | $2,360,603.00 |

The Plaintiffs' only support for their contention that the Cherry Hill Claims are false consists of the Debtor's retraction of a letter that he previously sent to the Trustee's attorney. On March 6, 2013, the Debtor wrote a letter (exhibit 76) to the Trustee's attorney describing the factual basis for the Cherry Hill Claims. The letter also explained that the entities that were responsible to pay these claims "were managed (and brought to ruin) by [Brown]." The letter went on to describe how Brown paid himself unauthorized management fees out of these entities, abandoned his duties to these entities, and left them behind as empty shells. Further, the letter stated that any records maintained by Brown are unreliable and/or false, and the only reliable records are his own, which he attached, including the dates and amounts that he loaned to the entities. The letter also stated that, after Brown filed bankruptcy, all of the real estate owed by these entities was lost through foreclosure, resulting in the complete loss of the Debtor's remaining investment. The letter concluded by acknowledging that the "Loans are worthless."

-49-

At trial, the Debtor did not initially recall ever retracting the March 6, 2013 letter. However, the Debtor was then shown a June 3, 2013 letter (exhibit 77) from Brown's attorney to the Debtor's attorney. This letter claimed that the Debtor's March 6, 2013 letter had defamed Brown, and demanded that the Debtor retract it. The basis for the demanded retraction was section (4) of a Settlement Agreement and Mutual Release (exhibit 69) that was entered into between the Debtor, Brown, and other parties to resolve various issues in the Brown Bankruptcy Cases. The Debtor then acknowledged that he sent a June 4, 2013 letter (exhibit 87) to Brown's attorney, stating "I hereby unconditionally retract the letter of 3/6/13 and each and every statement in the letter regarding JEFFREY H. BROWN."

The Plaintiffs insist that the Debtor's June 4, 2013 letter constitutes an admission by the Debtor that the Cherry Hill Claims described in his earlier March 6, 2013 letter were false. The Debtor disagrees, explaining that this retraction only pertained to his statements about Brown, not about the Cherry Hill Claims. The Debtor argues that he said nothing in the retraction letter that could be read as retracting the Cherry Hill Claims.

The second group of allegedly false accounts or loans receivable claims disclosed by the Debtor on line 16 on his schedule B consists of claims ("Capitol Park Claims") owed to him by the following entities in the amounts indicated:

| | |
|---|---|
| Capitol Park Associates, LLC | $ 764,098.00 |
| West Town Line Associates, LLC | $1,304,536.00 |
| Summer Park Associates, L.L.C. | $1,077,000.00 |
| Peninsula Development Associates, L.L.C. | $ 144,500.00 |
| Total | $3,290,134.00 |

According to the Plaintiffs, the falseness of these claims is established through a 2008 state court lawsuit in Oakland County Circuit Court that ended with a voluntary dismissal with prejudice.

-50-

Specifically, the Plaintiffs argue that the Capitol Park Claims were released by the dismissal of that case. The Debtor counters that the dismissal of that case did not release the Capitol Park Claims, which he contends were not at issue in that suit.

The Debtor testified that he held interests either directly or indirectly in each of the entities that owe him the Capitol Park Claims. He explained that he caused Capitol Park Associates and West Town Line Associates to file a lawsuit against Mack & Meldrum Associates, L.L.C., which was also a member of Capitol Park Associates and West Town Line Associates. The Debtor further recalled that Mack & Meldrum Associates filed a counter-complaint and third-party complaint, and that the litigation was dismissed with prejudice. The Debtor denied that he individually was a party to the lawsuit, and testified that the state court case had nothing to do with the Capitol Park Claims.

The Debtor's testimony is consistent with his June 6, 2013 affidavit (exhibit 107). In paragraph 20, the Debtor swears that he provided documentation of his loans that give rise to the Capitol Park Claims to the accountants for these entities, and the loans were included in their income tax returns. Further, he swears that the stipulated order of dismissal with prejudice entered by the Oakland County Circuit Court case discharged Mack & Meldrum from liability and discharged the Debtor from any liability to Mack & Meldrum, but says nothing about discharging the Capitol Park Claims. There is no contrary evidence in the record.

The Debtor's testimony regarding these accounts receivable leaves the Court with the firm impression that the Debtor had a sincere belief that each of these accounts receivable were truly owed to him. That triggers a duty to disclose them. While it is ultimately the Trustee's duty to investigate the value of those assets, and determine whether and how they can be administered for the estate, the Debtor has an unqualified statutory duty of disclosure. If he believes that he owns

these assets, then he must disclose them, regardless of whether the claims are of dubious value, or just plain worthless, as the Debtor described the Cherry Hill Claims and the Capitol Park Claims in his letter (exhibit 76) to the Trustee's attorney. The Court is quite confident that if the Debtor had failed to list either the Brown Bankruptcy Claims or the accounts receivable, the Plaintiffs would have been the first to complain that the Debtor was concealing them.

Further, the Trustee's testimony does not support the Plaintiffs' allegation that the Debtor made a false oath by listing these assets. The only one of these assets that the Trustee was asked about at trial was the account receivable from Apartments at Cambridge Company, L.L.C. The Trustee testified only that his financial advisor determined, after reviewing bank statements, that Apartments at Cambridge Company, L.L.C. owed the Debtor over $5 million. The evidence does not prove that the Debtor made false oaths by listing these accounts receivable on schedule B.

In addition to failing to prove that either the Brown Bankruptcy Claims or the accounts receivable are false claims, the Plaintiffs also failed to prove their allegation that the Debtor listed them with the intent to mislead the Trustee in an attempt to somehow curry the Trustee's favor and misdirect the Trustee's efforts to administer the Debtor's estate. There is no evidence in the record regarding the Debtor's intent in listing these assets other than the Debtor's own uncontroverted testimony. Although the Trustee was not directly asked about the Debtor's intent in listing these assets, it is worth noting that the Trustee does not appear in any way to have actually been lulled into pursuing these assets in lieu of taking action against the Debtor. In addition to prosecuting this adversary proceeding, the Trustee has also brought multiple other actions against the Debtor, some of which have already been successful (e.g., adversary proceeding no. 14-5115, invalidating the

-52-

Lewiston Trust) and some of which are still pending (e.g., adversary proceeding no. 14-4717, seeking recovery of fraudulent transfers).

The Court finds that the Plaintiffs failed to prove that the Debtor knowingly and fraudulently made a false oath or account.

## IX.

### Section 727(a)(4)(B)

Section 727(a)(4)(B) provides for denial of discharge if "the debtor knowingly and fraudulently, in or in connection with the case . . . presented or used a false claim[.]" "There is little case law applying § 727(a)(4)(B). The courts that have considered objections to discharge for presenting a false claim have required the objecting party to prove that the debtor presented or used an inflated or fictitious claim." Hendon v. Oody (In re Oody), 249 B.R. 482, 487 (Bankr. E.D. Tenn. 2000) (internal quotation marks and citations omitted).

Like their objection to discharge under § 727(a)(4)(A), the Plaintiffs rely for this objection on the Debtor's inclusion of the Brown Bankruptcy Claims and the accounts receivable on his schedule B as the false claims that support their § 727(a)(4)(B) objection. However, for the same reasons that the Court detailed in its discussion of § 727(a)(4)(A), the Plaintiffs failed to prove that either the Brown Bankruptcy Claims or the accounts receivable are false claims. The evidence shows that the Debtor and the Plaintiffs have strong competing views about the Debtor's obligation to disclose the Brown Bankruptcy Claims and the accounts receivable. That is not sufficient to prove that they are false claims. As for the Debtor's intent in listing these claims, the evidence shows that the Debtor disclosed all of them out of an abundance of caution in the interest of full

disclosure. There simply is no evidence that the Debtor was trying to mislead the Trustee or anyone else when he listed them.

The Debtor does not have the burden to prove that the claims he disclosed are legitimate and have value. Instead, the burden is on the Plaintiffs to prove that the claims are false and that the Debtor listed them with the intent to deceive. The Court finds that the Plaintiffs failed to meet their burden of proof that the Debtor presented or used a false claim.

## X.

### Section 727(a)(4)(D)

Section 727(a)(4)(D) provides for denial of discharge if "the debtor knowingly and fraudulently, in or in connection with the case . . . withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs[.]"

> [T]he party objecting to discharge under 11 U.S.C. § 727(a)(4)(D) has the initial burden of proving that: 1) the withholding of documents was done by the debtor or someone for whose conduct the debtor is legally responsible; 2) was in connection with a case; 3) was withheld from an officer of the estate entitled to possession; 4) was done knowingly and fraudulently; and 5) relates to the debtor's property or financial affairs.

Olson v. Slocombe (In re Slocombe), 344 B.R. 529, 534 (Bankr. W.D. Mich. 2006) (citations omitted).

The Plaintiffs rely on the Trustee's minimal testimony concerning the Debtor's bank statements to prove that the Debtor knowingly and fraudulently withheld documents from an officer of the estate. On the one hand, the Trustee was asked about bank statements that he had requested, and he testified the Debtor had provided some, but did not provide others. On the other hand, as noted, the Debtor testified without contradiction that neither the Trustee nor the Trustee's counsel

-54-

ever contacted him asking for additional documentation or an explanation of his Comerica Bank statements. The Trustee was also asked whether there were other areas where the Debtor had not been cooperative in providing information. The Trustee answered that there were "a couple of occasions where we've requested information and have not been provided." Those areas concerned exemptions, the Lewiston Trust and Lewiston/Etterbeek, L.L.C. The Trustee was not asked any follow up questions about recorded information that he had requested and was not provided. This is not sufficient to demonstrate that the Debtor withheld recorded information from the Trustee.

Even assuming that the evidence was sufficient to find that the Debtor withheld recorded information, the withholding must be knowing and fraudulent. The record is devoid of any evidence, or even an inference, that the Debtor acted knowingly and fraudulently in his interactions with the Trustee. To the contrary, the evidence shows that the Debtor was forthcoming in providing additional information to the Trustee, such as the letters (exhibits 24 and 50) to the Trustee explaining the history of RMLC and RSJC Associates LP and the Affiliated Partnerships, and the affidavit (exhibit 107) that he filed explaining his relationship with many of the business entities previously discussed in this opinion, and why he believed that his scheduling of certain accounts receivable and the Brown Bankruptcy Claims was accurate and truthful.

The Court finds that the Plaintiffs failed to prove by a preponderance of the evidence that the Debtor knowingly and fraudulently withheld recorded information.

## Section 727(a)(5)

Section 727(a)(5) provides for denial of discharge if "the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities . . . ."

> Section 727(a)(5) is broad enough to include any unexplained disappearance or shortage of assets. The initial burden is on the objecting party to introduce some evidence of the disappearance of substantial assets or of unusual transactions. The debtor must then satisfactorily explain what happened. To be satisfactory, an explanation must convince the judge.

Solomon v. Barman, 244 B.R. at 900 (internal quotation marks and citation omitted). Thus, a debtor need not have acted reasonably in dissipating assets, but he must have an explanation that is reasonably supported by the evidence.

The Plaintiffs allege that the Debtor has not adequately explained his loss of income consisting of $32 million in income reported on the Debtor's 2006 tax return, and $9 million received from the Debtor's liquidation of U.S. Treasury bills in 2007.

Without a doubt, the evidence shows that the Debtor had income of up to $32 million in 2006 and that, when he filed bankruptcy in 2012, he disclosed on schedule B only $253.00 in his Comerica Bank checking account. An explanation from the Debtor as to what became of the $32 million is certainly warranted.

The Debtor testified that most of the income reported on his 2006 federal tax return was from the sale of RSJC Associates and the Affiliated Partnerships that year. Of that income, the Debtor testified that the $32 million reported income included non-cash items, such as deferred depreciation recapture, and that he received only approximately $27.1 million in actual income. This testimony

is corroborated by the Debtor's 2006 federal tax return (exhibit 60) and by his QuickBooks report (exhibit 160) showing deposits totaling approximately $27.1 million into the Debtor's Comerica Bank checking account on May 15 and 16, 2006.

The Debtor further testified that $19 million of the 2006 income was almost immediately transferred into the Debtor's securities account at Comerica Bank. This testimony is corroborated by a QuickBooks report (exhibit 159) for the Debtor's Comerica Bank securities account, showing a deposit of $19 million into that account on May 30, 2006. The Debtor testified without contradiction that he used this $19 million for two types of investments: to purchase approximately $8.9 million in U.S. Treasury bills and to invest the balance in overnight repurchase agreements.

The Debtor further testified that he would transfer funds from his securities account to his checking account to pay expenses as needed. This testimony is also substantiated by evidence, including checking account statements (exhibit K) and a QuickBooks report (exhibit 159) for his securities account, showing periodic transfers of several hundred thousand dollars from the securities account to the Debtor's checking account throughout 2007. The Debtor explained that, as he withdrew money from the securities account in 2007, it became advantageous to sell the U.S. Treasury bills. According to the Debtor's testimony, he purchased the bills in 2006 for approximately $8.9 million, and sold them in 2007 for approximately $9 million, for a profit of around $95,000.00. The Debtor explained that this is why his 2007 federal tax return (exhibit 61) shows a sale of $9 million in U.S. Treasury bills; however, those bills were purchased with some of the $27 million in income that he received in 2006. There is no evidence in the record to contradict this testimony.

The Debtor also provided an explanation of his income and expenses during this time period. He provided the Trustee with all of his Comerica Bank checking and money market statements from 2007 through 2010 (exhibit K) and testified that these were the only accounts he used for his income and expenses. He also provided QuickBooks records through 2012 (exhibits 160-163). The Debtor testified that his aggregate income between the beginning of 2007 and the end of 2012 was approximately $30.3 million. He further testified that his expenses for the same period totaled $30.8 million and could be categorized as follows: $6.5 million for payments to banks; $9.8 million for advances and contributions to entities he owned; $3.5 million for business expenses; $1.8 million for taxes; $1.1 million for credit card charges; $6.8 million for family and family support obligations; $125,000.00 for charitable contributions; and $1.2 million on a jet aircraft.

During cross examination, the Plaintiffs focused on the Debtor's bank statements, which show deposits of tens of millions of dollars without a description of where these deposits came from or where the money went. Specifically, the Plaintiffs pointed to the Debtor's checking account statements for January, February, and March, 2007 (exhibit K), which show deposits and withdrawals of $70 million, $54 million and $39 million, respectively. However, the Debtor explained that this account was used for overnight repurchase agreements so that, every month, a certain amount of money would be taken out, used in overnight trading, and re-deposited the next morning. The total amount of deposits and withdrawals looks large, but it is actually the same money being withdrawn and re-deposited. This explanation is substantiated by the bank account statements themselves. For example, the January, 2007 statement shows that the same $8.9 million dollars was withdrawn on January 19, re-deposited the same day, withdrawn on January 26, re-deposited the same day, withdrawn on February 2, and re-deposited the same day, and so on.

-58-

The Plaintiffs met their initial burden by introducing the Debtor's tax returns reflecting significant income in 2006 and 2007, and showing that only $253.00 remained in his checking account when he filed bankruptcy in 2012. The Plaintiffs then examined the Debtor at length about the income that was shown on the tax returns and the substantial sums that were reflected on his bank statements. It is clear from the Debtor's testimony that he did spend enormous amounts of money during this time. And the Plaintiffs were successful in showing through the Debtor's testimony that he enjoyed a lavish, even extravagant lifestyle during this period. But the Debtor answered all of the Plaintiffs' questions. The Debtor's explanation was complicated, no doubt. But it was believable. And, significantly, the Plaintiffs did not offer any evidence to contradict the Debtor's explanation. The Plaintiffs may not have liked the Debtor's explanation, but the Court finds the Debtor's explanation to be satisfactory. The Court finds that the Plaintiffs failed to meet their burden to prove that the Debtor has failed to explain satisfactorily a loss of assets.

## XII.

### Section 727(a)(7)

Section 727(a)(7) provides for denial of discharge if

> "the debtor has committed any act specified in paragraph (2), (3), (4), (5), or (6) of this subsection, on or within one year before the date of the filing of the petition, or during the case, in connection with another case, under this title or under the Bankruptcy Act, concerning an insider . . . ."

Barclays/American Business Credit, Inc. v. Adams (In re Adams), 31 F.3d 389, 394 n.2 (6th Cir. 1994) (quoting 11 U.S.C. § 727(a)(7)). There are four elements to § 727(a)(7): (1) the act must be committed by the debtor; (2) the act must be within those described in § 727(a)(2) through (a)(6); (3) the time frame is limited to one year pre-petition, or during the case; and (4) the act must have

-59-

been committed in connection with another case concerning an insider. "Insider" is determined by applying the definition in § 101(31).

This basis for denial of discharge received very little attention throughout the trial. The Plaintiffs allege in their complaint that, using the definitions under § 101(31)(A) and § 101(45), the Etterbeeks, Jason, Lois and Jennifer Lewiston[9] are insiders of the Debtor. The complaint then simply concludes that the Debtor's transfer of his ownership in several, if not all, of the business entities described above, to these insiders, prevents him from receiving a discharge. The Plaintiff's post-trial brief is just as conclusory, quoting § 727(a)(7) and listing the acts committed by the Debtor that form the grounds for denial of discharge under § 727(a)(2), (3), (4) and (5).

The evidence adduced at trial unquestionably demonstrates that the Etterbeeks, Jason and Lois are insiders of the Debtor. However, there is no testimony or other evidence to show that any of these individuals have ever filed for bankruptcy. It is not enough under § 727(a)(7) that the Debtor took actions that may form the basis for denial of discharge under paragraphs (2), (3), (4), (5), or (6). In order to form a basis for denial of discharge under § 727(a)(7), those acts must be in connection with *another* case concerning an insider. There is no such case here. Accordingly, the Court finds that the Plaintiffs have failed to meet their burden to prove that any of the acts alleged to have been committed by the Debtor were committed in connection with another case concerning an insider.

---

[9] The complaint alleges that Jennifer Lewiston is the Debtor's daughter-in-law. Over the course of the four-day trial, her name came up only once, when she was identified as a co-defendant in an adversary proceeding brought by the Trustee to avoid fraudulent conveyances.

## XIII.

## Conclusion

In many ways this is an extraordinary case. In part that is due to the nature, duration and complexity of the Debtor's business affairs, which for many years were very successful. In part, it is due to the level of animosity that, unfortunately, developed as the Debtor's financial condition deteriorated and now firmly exists between the Plaintiffs (other than the Trustee) and the Debtor. The legal issues raised by the Plaintiffs in their objections to the Debtor's discharge are neither complex nor difficult. But the facts are. The parties developed a very substantial evidentiary record at trial. But it basically boils down to two witnesses, the Debtor and the Trustee, and the many documents[10] that the Plaintiffs culled from records of the Debtor and others, that the Plaintiffs used to build their case that the Debtor is not truthful.

The Debtor testified for four days and was examined regarding many documents spanning decades. The Plaintiffs succeeded in picking out many errors and inconsistencies in those documents.[11] The Plaintiffs also succeeded in proving that the Debtor made some omissions and errors in his schedules and statement of financial affairs. However, there is no evidence in the record to contradict the Debtor's explanations for any inconsistencies, errors and omissions. As a result, this case turns on the credibility of the Debtor's explanations. For the reasons already explained, the Court found the Debtor's testimony to be credible. The Court also found the Trustee

---

[10] The Court did not specifically mention each of the Plaintiffs' exhibits in this opinion, but it examined and considered all of them in making its findings of fact and conclusions of law.

[11] The Plaintiffs also asked the Debtor at trial about some other potential discrepancies in the schedules and statement of financial affairs but the Court need not address them because they were not the subject of any of the allegations in the complaint.

to be credible, but his brief testimony hardly touched upon, let alone proved, any of the Plaintiffs' claims.[12]  By any measure, the Debtor's bankruptcy case has not been perfect.  However, in the final analysis, the Plaintiffs' evidence does not convince the Court that the Debtor should be denied a Chapter 7 discharge.

The Court will enter a separate order consistent with this opinion.

.

```
Signed on September 10, 2015
                                        /s/ Phillip J. Shefferly
                                     Phillip J. Shefferly
                                     United States Bankruptcy Judge
```

---

[12] The Trustee was only asked questions about the Plaintiffs' objections under § 727(a)(3).  He was not asked a single question about the facts that the Plaintiffs alleged to support their other objections to discharge under § 727(a)(2), (4), (5) and (7).